IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| USDIGITAL, INC., | ) | Case No. 07-10374 (CSS) |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| JEOFFREY L. BURTCH, | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 09-50469 (CSS) |
| | ) | |
| JOSEPH C. HUSTON, STEVEN | ) | |
| LINDSLEY, KEVIN DOMAN, | ) | Related Docket No. 65 |
| CHARLES S. MCNEIL, | ) | |
| MARK ZEIGLER, BRIAN HUMPHREY, | ) | |
| NEXGEN TELECOM, LLC, | ) | |
| INFINIDI MEDIA, INC. AND | ) | |
| STONEBRIDGE MARKETING, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**ASHBY & GEDDES, P.A.**
Gregory A. Taylor
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19801
   -and-
**HOLME ROBERTS & OWEN LLP**
Michael J. Hoffman
1700 Lincoln Street, Suite 4100
Denver, CO 80203

Counsel for Charles S. McNeil, Mark Ziegler,
Brian Humphrey, and NexGen Telecom, LLC.

**COOCH & TAYLOR, P.A.**
R. Grant Dick IV
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE 19899-1680

Counsel for Plaintiff

Dated:  December 20, 2011

Sontchi, J. _____

## INTRODUCTION

The issue before this Court involves the Supreme Court's recent opinion in *Stern v. Marshall*.[1]  Before turning to the merits of this case, however, the Court will set the table by offering its general observations as to the holding in *Stern*, its limits and its import.

1.    *Stern* in no way limits the bounds of a bankruptcy court's subject matter jurisdiction.[2]    At the very least the bankruptcy court must have "related to" jurisdiction.[3]

2.    *Stern* does not affect the statutory distinction between core and non-core proceedings set forth in 28 U.S.C. §157.[4]  In order for a matter to be core it must, at least, be core under the statute.[5]

---

[1]  *Stern v. Marshall*, ___ U.S. ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) [hereinafter *Stern*].

[2]  *Id*. at 2607 ("Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction.") (internal citations omitted).

[3]  *Id*. at 2603 ("With certain exceptions not relevant here, the district courts of the United States have 'original and exclusive jurisdiction of all cases under Title 11.'   Congress has divided bankruptcy proceedings into three categories: those that 'aris[e] under Title 11'; those that 'aris[e] in' a Title 11 case; and those that are 'related to a case under Title 11.' ") (internal citations omitted).

[4]  *Id*. at 2608 ("[W]e conclude that §157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim.").

[5]  *Id*. at 2604–05. ("Pierce's reading of the statute necessarily assumes that there is a category of core proceedings that neither arise under Title 11 nor arise in a Title 11 case.  The manner in which the statute delineates the bankruptcy courts' authority, however, makes plain that no such category exists . . .  Nowhere does §157 specify what bankruptcy courts are to do with respect to the category of matters that Pierce posits–core proceedings that do *not* arise under Title 11 or in a Title 11 case.  To the contrary, §157(b)(3) only instructs a bankruptcy judge to 'determine . . . whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under Title 11.'  Two options. The statute does not suggest that any other distinctions need be made.  Under our reading of the statute, core proceedings are those that arise in a bankruptcy case or under Title 11.  The detailed list of core proceedings in section 157(b)(2) provides courts with ready examples of such matters").

3.      If a matter is a core proceeding under the statute then the bankruptcy judge must also have the judicial authority under the Constitution to enter final orders for the proceeding to be truly core.[6]

4.      If a matter is core under the statute *and* the Constitution then the bankruptcy judge may enter final orders, which are subject to normal appellate court review by the district court.[7]

5.      Non-core proceedings are those that (a) are not core under the statute;[8] *or* (b) are core under the statute but over which the bankruptcy judge lacks the judicial power under the Constitution to enter final orders.[9]   The parties in a matter may stipulate that it is a non-core proceeding.[10]

6.      The bankruptcy judge's power over non-core proceedings is limited to issuing proposed findings of fact and conclusions of law that are subject to *de novo* review by the district court.[11]   It is unclear whether the parties in a matter may stipulate that it is a core proceeding.[12]

---

[6]  *Id*. at 2608.

[7]  *Id* at 2610–11.

[8]  *Id* at 2600.

[9]  *Id*. at 2608–09.

[10]  *Id*. at 2607–08 (finding that claimant waived his right to have *core* matter heard by district court).

[11]  *Id*. at 2604.

[12]  *See Id*. at 2606 ("Given the limited scope of [28 U.S.C. §157(b)(5)], *Vickie argues*, a party may waive or forfeit any objections under §157(b)(5), in the same way *that a party may waive or forfeit an objection to the bankruptcy court finally resolving a non–core claim*.") (emphasis added).   Although the Court ruled that Pierce consented to having his defamation claim "tried" in district court, it did not rule on Vickie's supposition that parties could consent or waive opposition to a bankruptcy court entering a final order in a non–core proceeding.   Indeed, the Court specifically did *not* rule as to whether waiver of the right to

7.    A finding that a matter is a non-core proceeding when it has been asserted to be core does not, in and of itself, result in dismissal of the claim.[13]

## FACTS OF THIS CASE

Certain of the defendants in this adversary proceeding seek a determination whether the six counts pending against them are core or non-core proceedings.[14]  These claims are:

| Count Number | Nature Of Claim | Defendants On Claim |
|---|---|---|
| 9 | Breach of fiduciary duty (based on the duty of loyalty and good faith) | McNeil, Ziegler, and Humphrey |
| 10 | Aiding and abetting breach of fiduciary duty | NexGen |
| 12 | Corporate waste and mismanagement | McNeil, Ziegler, and Humphrey |
| 13 | Unjust enrichment | McNeil, Ziegler, Humphrey, and NexGen |
| 15 | Equitable subordination | McNeil, Ziegler, Humphrey, and NexGen |
| 16 | Accounting | McNeil, Ziegler, Humphrey, and NexGen |

The plaintiff concedes that counts 9, 10, 12, 13, and 16 are non-core proceedings.[15]

Thus, the question is whether the remaining count, Count 15, which seeks equitable

---

trial in district court "permits the bankruptcy court to resolve the claim short of trial" as would be the case if the court had authority to enter a final order in the matter.  *Id*. at n. 4.  *See also* n. 88, *infra*,

[13]  *Id*. at 2604–05 (matters are either core or non–core).

[14]  Defendants Charles S. McNeil, Mark Ziegler, Brian Humphrey and NexGen Telecom, LLC's Motion for Determination of Core and Non–Core Proceedings [Adv. Pro. Do. 65] filed on September 20, 2011.

[15]  *See* n. 10, *supra*.  The Court offers no comment nor ruling as to whether these counts are core or non–core proceedings.

subordination of the claims of Messrs. McNeil, Ziegler, and Humphrey as well as NexGen, is a core or non-core proceeding.

## LEGAL DISCUSSION

The Court starts with the statute. In order for a matter to be a core proceeding it must, at least, be core under the statute.[16] If the matter meets the statutory definition of a core proceeding, then the bankruptcy judge must consider whether, under the Constitution, he or she has the judicial power to enter final orders in the matter. If *Stern* is (a) not applicable; *or* (b) is applicable and, by its application, the bankruptcy judge has sufficient judicial power to enter final orders, Count 15 is a core proceeding.[17] If *Stern* is (a) applicable; *and* (b) by its application, the bankruptcy judge has insufficient judicial power to enter final orders, Count 15 is a non-core proceeding.

In this case, Count 15 is a core proceeding under the statute and *Stern* is not applicable. Thus, Count 15 is a core proceeding.

### 1.    *Stern v. Marshall*: The Facts and Procedural History[18]

Vickie Lynn Marshall (Vickie) married J. Howard Marshall II (J. Howard) in 1994. Less than a year later, J. Howard died. Although he lavished gifts and significant

---

[16] *See* n. 5, *supra*.

[17] There are a number of other Supreme Court opinions (discussed below) relating to whether a bankruptcy court has judicial authority to enter final orders in certain matters. *See, e.g., Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*; *Granfinanciera, S.A. v. Nordberg*; *Katchen v. Landy*; and *Langenkamp v. Culp*. This Court is not implying that, as a result of *Stern*, these cases are inapplicable to the determination of whether a court has judicial authority to enter final orders. Rather, the court is focusing on *Stern* as it is the most recent and broadest iteration of the Supreme Court's jurisprudence relating to judicial authority and it is the most relevant case to the issue before the Court.

[18] *Stern* at 2601–03.

sums of money on Vickie during their courtship and marriage, J. Howard did not include Vickie in his will.  E. Pierce Marshall (Pierce), one of J. Howard's sons, was the ultimate beneficiary of J. Howard's estate plan.

Before J. Howard passed away, Vickie filed suit in Texas state probate court, asserting that Pierce fraudulently induced J. Howard to sign a living trust that did not include her, even though J. Howard meant to give her half of his property.  Pierce denied any fraudulent activity and defended the validity of J. Howard's trust and, eventually, his will.

Subsequently, Vickie filed bankruptcy.  Pierce commenced an adversary proceeding in the bankruptcy case in which he contended that Vickie had defamed him by inducing her lawyers to tell members of the press that he had engaged in fraud to gain control of his father's assets.  Through the adversary proceeding, Pierce sought a declaration that his defamation claim was not dischargeable in the bankruptcy.  Later, Pierce filed a proof of claim in Vickie's bankruptcy case seeking to recover damages from Vickie's estate for the defamation action.

Vickie responded to Pierce's initial complaint to exclude his claim from Vickie's discharge by asserting truth as a defense to the alleged defamation.  *In addition, she filed a counterclaim in the adversary proceeding for tortious interference with the gift she expected from J. Howard.*  As she had done in state court prior to her bankruptcy filing, Vickie alleged that Pierce had wrongfully prevented J. Howard from taking the legal steps necessary to provide her with half of his property.

In November, 1999, the bankruptcy court issued an order granting Vickie summary judgment on Pierce's claim for defamation. In September, 2000, after a bench trial, the bankruptcy court issued a judgment on Vickie's counterclaim in her favor. The bankruptcy court awarded Vickie over $400 million in compensatory damages and $25 million in punitive damages.

Pierce appealed to the district court, asserting, among other things, that Vickie's counterclaim was not a core proceeding. Meanwhile, back in Texas, the state court had conducted a jury trial on the merits of the parties' dispute and entered a judgment in Pierce's favor.

Back in district court on the appeal (and after the entry of the state court's judgment), the district court concluded that Vickie's counterclaim was not core and it was required to treat the bankruptcy court's judgment as proposed rather than final. As such, the district court was required to engage in a *de novo* review of the record. In making its *de novo* ruling, the district court declined to give the Texas state court's intervening ruling preclusive effect. Like the bankruptcy court, the district court found that Pierce had tortiously interfered with Vickie's expectancy of a gift from J. Howard and awarded Vickie compensatory and punitive damages-each in the amount of approximately $44 million.

Pierce appealed to the Ninth Circuit Court of Appeals. After an appeal to the Supreme Court on a different issue in which the Supreme Court reversed and remanded the case, the Ninth Circuit ruled on the core vs. non-core issue. The Ninth

Circuit held that §157 mandated "a two-step approach" under which a bankruptcy judge may issue a final judgment in a proceeding only (i) if the matter meets Congress' definition of a core proceeding; *and* it arises under or arises in title 11 of the Bankruptcy Code.[19]   As to the second prong, the Ninth Circuit concluded that "'a counterclaim under §157(b)(2)(C) is properly a "core" proceeding "arising in a case under" the [Bankruptcy] Code only if the counterclaim is so closely related to the [creditor's] proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself.'"[20]

The Ninth Circuit then held that Vickie's counterclaim for tortious interference to Pierce's claim against the estate for defamation was not a core proceeding because it did not meet the second prong of the statutory test.[21]   It went on to hold that "the Texas probate court's judgment was the earliest final judgment entered on matters relevant to this proceeding" and the district court should have "afford[ed] preclusive effect" to the Texas "court's determination of relevant legal and factual issues."[22]

The bankruptcy court's ruling was held to be "proposed findings of fact and conclusions of law" and, thus, not binding.  Final judgment was not entered in the federal court until the district court entered its judgment after *de novo* review.  As the district court's ruling occurred after the entry of the state court judgment, Pierce won

---

[19]  *Marshall v. Stern (In re Marshall),* 600 F.3d 1037, 1055 (9th Cir. 2010).

[20]  *Id.* at 1058 (internal citation omitted).

[21]  *Id.* at 1059.

[22]  *Id.* at 1064–65.

the race to the courthouse and Vickie's counterclaim in federal court was defeated. Vickie appealed to the Supreme Court.

### 2. *Stern v. Marshall*: The Statute

The *Stern* Court reversed the Ninth Circuit's interpretation of the statutory test for determining whether a matter is a core or non-core proceeding.[23]  The Supreme Court analyzed two discrete issues in turn: (1) was Vickie's counterclaim a core proceeding under §157(b)(2)(C); and (2) if the counterclaim was a core proceeding under the statute, would it constitute an impermissible delegation of judicial power to a non-Article III tribunal to allow the bankruptcy judge to enter a final order on Vickie's counterclaim.[24]  The Supreme Court held that, although section 157(b)(2)(C) "permits the Bankruptcy Court to enter final judgment on Vickie's counterclaim, Article III of the Constitution does not."[25]  This Court will discuss the statutory and Constitutional issues separately.

---

[23] Nonetheless, the Supreme Court affirmed the Ninth Circuit's holding that Vickie's counterclaim was a non–core proceeding on constitutional grounds.  *See* pp. 16–19, *infra*.

[24]  The Court also analyzed whether the bankruptcy court had subject matter jurisdiction to enter final judgment on Pierce's defamation claim as "[s]ection 157(b)(5) provides that '[t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose.'" Pierce asserted that his defamation claim was a "personal injury tort," over which the bankruptcy court did not have jurisdiction and, as a result, the court necessarily lacked jurisdiction over Vickie's counterclaim as well.  *Stern* at 2606–08.  The Court rejected Peirce's argument and found that section 157(b)(5) was not jurisdictional and that Peirce had consented to the bankruptcy court's resolution of his defamation claim. *Id*.  As the case before this court does not implicate section 157(b)(5), no further discussion of this issue is necessary.

[25]  *Stern* at 2608.

### A.    Core Proceedings Under The Statute

In analyzing whether a matter is a core proceeding under the statute there are two related issues at play: jurisdiction and judicial power.  As to jurisdiction, district courts have "original and exclusive jurisdiction of all cases under title 11."[26] Proceedings in cases under title 11 (over which the district courts have original but not exclusive jurisdiction) are further divided into three parts: those that (i) "aris[e] under title 11"; (ii) "aris[e] in" a title 11 case; and (iii) are "related to a case under title 11."[27]

As to judicial power, district courts may refer any or all such proceedings to the bankruptcy judges of their district.[28]  Bankruptcy judges may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11."[29]  "'Core proceedings include, but are not limited to' 16 different types of matters," including 'counterclaims by [a debtor's] estate against persons filing claims against the estate.'"[30]  The bankruptcy judge's power over non-core proceedings is limited to issuing proposed findings of fact and conclusions of law that are subject to *de novo* review by the district court.[31]

In considering the extent of the bankruptcy courts' judicial authority under the statute, the Supreme Court held that there are two distinct possible outcomes.  The first

---

[26]  28 U.S.C. §1334(a).

[27]  28 U.S.C. §157(a)

[28]  *Id.*

[29]  28 U.S.C. §157(b)(1)

[30]  *Stern* at 2604 (quoting 28 U.S.C. §157(b)(2)(C)).

[31]  *Id.* at 2604.

is that the district court has jurisdiction over a matter because it "arises under" or "arises in" title 11. Further the "arising under" and "arising in" matters are, *by definition*, core proceedings in which the bankruptcy courts may enter final orders. The second possibility is that the district court has jurisdiction because a matter is "related to" a case under title 11. "Related to" matters are, *by definition*, non-core proceedings in which the bankruptcy courts may only issue proposed finding of fact and conclusions of law. There is no middle ground. A core proceeding may not be "related to" a case under title 11; and a non-core proceeding may not "arise in" or "arise under "title 11. Thus, the terms "core proceedings" on the one hand and matters "arising in" or "arising under" on the other are, in effect, interchangeable. The existence of one presupposes the existence of the other.[32]

Having determined the foregoing, the Supreme Court was faced with the problem that the terms "arising in" and "arising under" are ambiguous.[33] At the same time, however, core proceedings are defined in detail in section 157(b). Indeed, that subsection contains a non-exclusive list of 16 specific matters that are core. The Court held that "[i]t is hard to believe that Congress would go to the trouble of cataloging 16 different types of proceedings that should receive "core" treatment, but then fail to specify how to determine whether those matters arise under Title 11 or in a bankruptcy

---

[32] *Id.* at 2604–05.

[33] *Id.* at 2604.

11

case."[34]   Thus, the Supreme Court held that, for purposes of the exercise of judicial power, "arising under" and "arising in" jurisdiction is defined by reference to the definition of core proceedings.  Indeed, the Court held that it would be oxymoronic to hold otherwise.  Core proceedings are defined, in turn, by the plain meaning of section 157(b).

Applying these holdings to the case before it, the Supreme Court found that, under the statute, Vickie's counterclaim arose in or under the bankruptcy case and was a core proceeding as "counterclaims by the estate against persons filing claims against the estate" are specifically denominated as "core" under section 157(b)(2)(C).

### b.    Count 15 Is A Core Proceeding Under The Statute.

Section 157(b)(2) sets forth a *non-exclusive* list of core proceedings.  If a matter fits into one of the 16 categories enumerated in the statute it is core.

The only enumerated items that might apply to the claim of equitable subordination in Count 15 are 28 U.S.C. §§157(b)(2)(B) and (O).  Section 157(b)(2)(B) provides that "allowance or disallowance of claims against the estate" are core proceedings.[35]   Subsection (b)(2)(O) provides that "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor...relationship" are core proceedings.[36]

---

[34] *Id*. at 2605.

[35] 28 U.S.C. §157(b)(2)(B).

[36] *Id*. at §157(b)(2)(O).

The court's power to subordinate claims is set forth in section 510(c) of the Bankruptcy Code.[37]  More specifically, 510(c) provides that "after notice and hearing, the court may-(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."[38] Section 510(c) does not involve the allowance or disallowance of claims. Rather, it addresses claims that have been allowed but which, nonetheless, should be subordinated under principles of equity.  Thus, section 157(b)(2)(B) does not provide statutory authority for finding that Count 15 is a core proceeding.

Next is section 157(b)(2)(O), which applies to the "liquidation of the assets of the estate or the debtor-creditor relationship."[39]  Section 510(c) does not involve the *assets* of the estate but rather the *claims against the estate*.  Also, it involves the *creditor-creditor* relationship rather than that *between the debtor and its creditors*.  Thus, section 157(b)(2)(O) does not provide statutory authority for finding that Count 15 is a core proceeding.

As stated above, however, section 157(b), is not an exclusive list of core proceedings.  There are matters not specifically enumerated in the statute but which may, in fact, be core.  Unfortunately, *Stern* does not provide guidance as to how one determines whether a matter is core when it is not specifically enumerated as such.

---

[37] 11 U.S.C. §510(c).

[38] *Id.*

[39] 28 U.S.C. §157(b)(2)(O).

This Court will look to existing Third Circuit law to inform its decision whether Count 15 is a non-enumerated core proceeding. The Third Circuit has adopted a two step process to determine whether a claim is a core proceeding. "First, 'a court must consult §157(b)' to determine if the claim at issue fits within that provision's 'illustrative list of proceedings that may be considered 'core.'" [40] If so, "a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."[41] The two-part second element of the test must be met for a proceeding to be core, regardless of whether it is enumerated in section 157(b)(2).

This second element of the Third Circuit's test has probably been overturned by *Stern*, at least with regard to enumerated core proceedings. Nonetheless, this Court finds that it serves well as the standard for determining whether a proceeding that is *not* enumerated is, nonetheless, core. Even a cursory review of the enumerated core proceedings supports this Court's reliance on the Third Circuit's test, subject to minor exceptions, as all of the enumerated core proceedings satisfy this test.[42] Thus, a matter may be core even if it is not enumerated as such "[1] if it invokes a substantive right

---

[40] *Shubert v. Lucent Techs. (In re Winstar Communs., Inc.)*, 554 F.3d 382, 405 (3d Cir. 2009) (quoting *Halper v. Halper*, 164 F3d 830, 836 (3d Cir. 1999)).

[41] *Id.*

[42] Why would the Third Circuit create an arguably superfluous element to its test? This Court believes that the Third Circuit–like the Ninth–was seeking to establish a test covering both the statute *and the Constitution*. *Stern* has divided the Court's inquiry into two elements: statutory and constitutional. But, given the overlap between the enumerated core proceedings and the second element of the Third Circuit's test, this Court finds it to be an appropriate measure in determining whether a matter is an a non–enumerated core proceeding.

provided by title 11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."[43]   The equitable subordination claim (Count 15) in this case satisfies both elements.

Equitable subordination is a substantive right specifically set forth in section 510(c).   That right allows a court "'to undo or to offset any inequality in the claim *position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.*'"[44]   Clearly, the remedy is a substantive element of *bankruptcy law* which, by definition, is "a substantive right provided by title 11."

In addition, equitable subordination, as set forth in section 510(c), can only be raised in bankruptcy court.   Like a preference claim-and unlike a fraudulent conveyance claim-it is a unique creature of bankruptcy law.[45]   Thus, Count 15, which asserts a claim for equitable subordination under 11 U.S.C. §510(c), is a non-enumerated core proceeding under 28 U.S.C. §157.   Thus, Count 15 is a core proceeding under the statute.[46]

---

[43]   *Winstar*, 554 F.3d at 405.

[44]   *Winstar,* 554 F.3d at 411 (emphasis added) (quoting *Citicorp Venture Capital, Ltd.v. Comm. of Creditors Holding Unsecured Claims,* 323 F.3d 228, 233–34 (3d Cir. 2003)).

[45]   Indeed, the only law in this Circuit concerning "subordination" arises in bankruptcy cases.   *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.),* 323 F.3d 228, 233 (3d Cir. 2003); *Burden v. United States,* 917 F.2d 115, 117 (3d Cir.  1990); *Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir. 1998); *see also Pepper v. Litton*, 308 U.S. 295, 306 (1939).

[46]   Defendants argue that Count 15 is a core proceeding because the factual allegations underlying the claim are solely related to pre-petition content.   First, the defendants are incorrect as a matter of fact.   While some pre-petition conduct is offered in support of the subordination of their claim, significant portions of the count deal with post-petition conduct.   Second, they are incorrect under the law.   Under the plain meaning of section 510(c), there is no distinction between pre-petition and post-petition conduct for purposes of determining whether a claim should be subordinated.   Third, as Count 15 is not a

**3.**    *Stern v. Marshall*: **The Constitution**

Next, this Court must address the Constitutional question.   First, is *Stern* applicable?  If not, that ends the inquiry and the matter is a core proceeding.[47]  If *Stern* is applicable, the Court must apply the case to determine whether it has sufficient judicial power in connection with Count 15 to enter final orders.

**a.  The Holding**[48]

The Supreme Court's constitutional analysis began with the twin purposes of granting Article III judges life tenure and salary guarantees-to protect the judicial branch from undue influence from the executive or legislative branch, and to provide individual litigants access to truly neutral judicial proceedings free of political influence.[49]  Citing the Framers' vehemence on this point, the majority adopted a strict approach to interpreting Article III, under which it is impermissible to allow judges without Article III protections to enter final judgments on matters that are "the subject of a suit at the common law, in equity or admiralty."[50]  The Court rejected the notion that Article III permits Congress to confer even the slightest amount of judicial power

---

counterclaim, *Stern* is inapplicable. *See* pp. 24-27, *infra*. Even if Count 15 referred solely to pre-petition conduct, Stern would not apply and Count 15 would constitute a legitimate exercise of this Court's judicial power.

[47]  The Court is assuming the other cases relating to the bankruptcy courts' judicial power are not applicable. *See* n. 17, *supra*.

[48]  For an excellent summary of the Supreme Court's holding *see* Nat'l Bankr. Conf. Comm. on Ct. and the Admin. Sys., The Scope and Implications of Stern v. Marshall, 131 S. Ct. 2594 (2011) (Oct. 26, 2011) (unpublished). *See also* Jonathan Azoff and Thomas Szaniawski, *Stern v. Marshall and the Limits of Consent*, 30–7 Am. Bankr. L.J. 28 (2011).

[49]  *Stern* at 2608–09.

[50]  *Id.* at 2609.

upon non-Article III courts.  Because Vickie's state-law counterclaim closely resembled a suit at common law, the Court held that the rationale supporting Article III simply did not allow the bankruptcy court, as an Article I court, to enter a final judgment.

Next, the Court examined at length whether Vickie's counterclaim might fit within the Court's ill-defined "public rights" exception.  At least since the decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,[51] the Court has recognized a set of matters in which Congress has the power to assign outside of the Article III judiciary for resolution.  The core of the "public rights" exception is that Congress enjoys flexibility in how to design the administration of a scheme when it creates new rights, even rights that just establish relationships among private parties.  Disputes in those circumstances need not be assigned to Article III courts, and Congress can assign administration of those disputes to administrative agencies or what might be labeled as "courts" even if they don't enjoy Article III protections.

The Court concluded in *Marshall* that Vickie's counterclaim did not "fall within any of the varied formulations of the public rights exception in this Court's cases."[52] Because Vickie's counterclaim did "not flow from a federal statutory scheme" or

---

[51] *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S. Ct. 2858, 73 L. Ed.2d. 598 (1982).

[52] Analyzing Vickie's tortious interference counterclaim under the public rights exception, the Court found her counterclaim to be functionally indistinguishable from the state–law contract claim at issue in *Marathon*.  In *Marathon*, the Court has held that permitting a bankruptcy court to enter final judgment on a contract claim, grounded exclusively in state law, violated Article III–at least where the estate had filed suit against a party that had not filed a proof of claim and was not otherwise a party to the bankruptcy. The *Marathon* Court noted that state–law contract claims are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," which are central to the Article III judicial cognizance. *Marathon*, 458 U.S. at 90.

"depend ... on the will of Congress," the Court held that it could not be characterized as a public right that could be withdrawn from the Article III judiciary's purview.[53] Instead, the Court concluded that Vickie's counterclaim "involves the most prototypical exercise of judicial power," which cannot be "taken from the Article III Judiciary simply by deeming it part of some amorphous 'public right.'"[54]

The *Stern* Court was not persuaded by Vickie's attempts to distinguish her counterclaim from the claim in *Marathon* on the basis that Pierce, unlike the defendant in *Marathon,* had filed a claim against Vickie's estate.[55]   The Court explained that although Pierce had consented to entry of a final judgment on his defamation claim against Vickie, "Pierce did not truly consent to resolution of Vickie's [counter] claim against him in the bankruptcy court proceedings" because "[h]e had nowhere else to go [with his claim] if he wished to recover from Vickie's estate."[56]   Further, the Court noted that "it is hard to see why Pierce's decision to file a claim should make any difference with respect to the characterization of Vickie's counterclaim."[57]   Like the *Marathon* Court, the *Stern* Court also rejected the argument that the bankruptcy court was an adjunct of the Article III district court.[58]   Thus, the Court ultimately concluded that while a faithful reading of §157(b) did provide statutory authority for the bankruptcy

---

[53]  *Stern* at 2615.

[54]  *Id.* at 2616.

[55]  *Id.*

[56]  *Id.* at 2614.

[57]  *Id.* at 2616.

[58]  *Id.* at 2618–19.

court to hear and determine Vickie's counterclaim as a core matter, that result violated Article III.[59]

<h3 style="text-align:center">b.    *Stern v. Marshall* **Must Be Read Narrowly**</h3>

*Stern* can be read to have broad implications as to the judicial power of bankruptcy courts.[60]  To do so, however, is contrary to the letter and the spirit of the Supreme Court's holding.  Chief Justice Roberts made as much clear in his summation: "We conclude today that Congress, *in one isolated respect*, exceeded" the Constitutional limitation on the exercise of judicial power to Article III judges by empowering the bankruptcy court "*to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim*."[61]  It is clear from the Court's own words in its conclusion that it considered its holding to be narrow.

Or did it?  In truth, there are a number of statements in the Court's opinion that would support interpreting it broadly.  Moreover, there are numerous inconsistencies in the opinion.  Nonetheless, the *Stern* Court's statement as to the breadth of the opinion cannot be ignored.

The nature of the conflict is readily apparent by comparing the introduction with the conclusion.  In the introduction, the Court broadly states that the bankruptcy court

---

[59]  *Id.* at 2620.

[60]  *See, e.g., In re Fairfield Sentry Ltd.*, 458 B.R. 665 (S.D.N.Y. Sept. 19, 2011*); Meyers v. Textron Fin. Corp. (In re AIH Acquisitions, LLC)*, 2011 U.S. Dist. LEXIS 101190 (N.D. Tex. Sept. 7, 2011); *Sitka Enters. v. Segarra–Miranda*, 2011 U.S. Dist. LEXIS 90243 (D.P.R. Aug. 10, 2011);  *Springel v. Prosser (In re Innovative Commun. Corp.)*, 2011 Bankr. LEXIS 3040 (Bankr. D.V.I. Aug. 5, 2011);  and *Samson v. Blixseth (In re Blixseth)*, 2011 Bankr. LEXIS 2953 (Bankr. D. Mont. Aug. 1, 2011).

[61]  *Stern* at 2620 (emphasis added).

"exercised the judicial power of the United States by entering final judgments on a *common law tort claim.*"[62]   But, in its conclusion, the Court narrowly stated that the bankruptcy court "lacked constitutional authority to enter a final judgment on a *state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim.*"[63] To what does the opinion apply-common law tort claims or state law counterclaims?

### (i)     Broad Interpretation

There are a number of statements in the opinion that support interpreting it broadly.

- In discussing the importance of the Article III courts' monopoly on the exercise of judicial power, the Court noted that the monopoly includes *any cause of action under common law-both "mundane as well as generous.*"[64]

- The Court described its holding in *Marathon* as concluding that "assignment of such *state law claims* for resolution by [bankruptcy] judges 'violates Art. III of the Constitution.'"[65]

- In discussing the scope of the "public rights" exception, the Court noted that it had concluded in *Marathon* "that the [public rights exception] did not encompass *adjudication of the state law claim at issue in that case.*"[66]

---

[62]  *Id.* at 2601 (emphasis added).

[63]  *Id.* at 2620 (emphasis added).

[64]  *Id.* at 2609 (emphasis added)

[65]  *Id.* at 2610 (emphasis added).

[66]  *Id.* (internal citations omitted) (emphasis added).

- In the Court's introduction to its discussion of the applicability of the "public rights" exception to the case before it, the Court broadly states that "[i]t is clear that the Bankruptcy Court in this case exercised the 'judicial Power [sic] of the United States' in purporting to resolve and enter final judgment on a *state common law claim*, just as the court did in [*Marathon*]."[67]  The Court went on to state that "*Vickie's claim is a state law action* independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy. *Marathon* and [the] subsequent decision in *Granfinanciera*,[68] rejected the application of the 'public rights' exception in such cases."[69]

- In its lengthy discussion of the public rights exception the Court noted that in *Granfinanciera* it rejected the argument that "a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor [sic] in a bankruptcy proceeding fell within the 'public rights' exception."[70]  It had further held in that case "that *fraudulent conveyance suits were 'quintessentially suits at common law that more nearly resemble state law contract claims* brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to

---

[67]  *Id*. at 2611 (emphasis added).

[68]  *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989).

[69]  *Stern* at 2611(emphasis added).

[70]  *Id*. at 2614.

a *pro rata* share of the bankruptcy *res*.'"[71]   And, as a result, "fraudulent conveyance actions were 'more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.'"[72]

- In concluding that Vickie's counterclaim did not qualify as a "public right" the Court compared her counterclaim to the fraudulent conveyance action in *Granfanaciera*.   "Vickie's counterclaim—like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases … *The claim is instead one under state common law between two private parties*."[73]

- The Court went on to reiterate that Vickie's counterclaim was not a "public right," stating that "[w]hat is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, *on a common law cause of action*, when the action neither derives from nor depends upon any agency regulatory regime."[74]

---

[71] *Id.* (quoting *Granfinanciera*, 492 U.S. at 56) (emphasis added).

[72] *Id.* at 2612 (quoting *Granfinanciera*, 492 U.S. at 55) (internal citations omitted) (emphasis added).

[73] *Id.* (emphasis added).

[74] *Id.* at 2615 (emphasis added).

- The Court then turned to the dissent's argument that the bankruptcy court had judicial power over Vickie's counterclaim because Pierce had filed a proof of claim. The Court disagreed, holding that "Pierce's claim for defamation in no way affects *the nature of Vickie's counterclaim for tortious interference as one at common law* that simply attempts to augment the bankruptcy estate—the very type of claim that we held in *[Marathon]* and *Granfinanciera* must be decided by an Article III court."[75]

- Finally, the Court turned to distinguishing *Stern* from its decisions in *Katchen*[76] and *Langenkamp*.[77] In those cases, the cause of action asserted was a preference-a creature of federal bankruptcy law. The Court noted, however, that "Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; *it is a state tort action* that exists without regard to any bankruptcy proceeding."[78]

While the actual issue before the Supreme Court was Vickie's state law counterclaim for tortious interference, the Court repeatedly used much broader terms-"cause of action under common law," "state law claim," "state common law claim," "state cause of action," "claim under state common law," "common law cause of action," and "state tort action." Read in isolation, one can see how these broad

---

[75] *Id*. at 2616 (emphasis added).

[76] *Katchen v. Landy*, 382 U.S. 323, 86 S. Ct. 467, 15 L.Ed. 2d 391 (1966).

[77] *Langenkamp v. Culp*, 498 U.S. 42, 111 S. Ct. 330, 112 L. Ed. 2d 343 (1990) (per curiam).

[78] *Stern* at 2618.

references seem to support interpreting the holding broadly.[79]   That, however, would be an incorrect application of the case because, in the end, the Court took back what it had appeared to have given and made it clear that its holding was a narrow one.

### (ii)    Narrow Interpretation

One of the primary arguments in favor of a narrow interpretation of *Stern* is the Supreme Court's belief that its ruling would have little effect.   Vickie had argued that "as a practical matter … restrictions on a bankruptcy court's ability to hear and finally resolve compulsory counterclaims will create significant delays and impose additional costs on the bankruptcy process."[80]   In response, the Court noted that efficiency, convenience, and usefulness, in and of themselves, will not save a law if it is contrary to the Constitution.   Nonetheless, the Court stated that it was "not convinced that the practical consequences of [its prescribed] limitations on the authority of bankruptcy courts to enter final judgments are as significant as Vickie and the dissent suggest."[81]

---

[79] "Read most broadly, the *Stern* court arguably calls into question the constitutional validity of much of the bankruptcy courts' authority to hear and determine core proceedings.  The decision pointed out that the Court has never determined whether any part of bankruptcy involves public rights.  Explaining that the *Granfinanciera* Court had expressly refrained from '"suggest[ing] that the restructuring of debtor–creditor relations is in fact a public right,"' the Court chose to follow the same approach in *Stern*.  Thus, the constitutional validity of the heart of the bankruptcy courts' decision–making authority has not been resolved.

Despite the Court's emphasis on the narrowness of its decision, its embrace of the absolute view that the determination of private rights must be left to Article III courts invites arguments that other types of core proceedings involve private rights that district judges must determine, at least if there is no valid consent to the entry of a judgment by a bankruptcy judge.  Much of the uncertainty caused by *Stern* arises from the attempt to determine where the public–private rights line is properly drawn."

Nat'l Bankr. Conf. Comm. on Ct. and the Admin. Sys., The Scope and Implications of <u>Stern v. Marshall</u> at *4 (internal citations omitted).

[80] *Stern* at 2619.

[81] *Id.*

Rather, the Court noted that "the current bankruptcy system also requires the district court to review *de novo* and enter final judgment on any matters that are 'related to' the bankruptcy proceedings, §157(c)(1), and permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part thereof, §157(d)."[82] Significantly, the Court concluded that it did "not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction *meaningfully changes the division of labor in the current statute*; we agree with the United States that *the question presented here is a 'narrow' one*."[83]    It is simply incredulous to conclude that the Supreme Court contemplated that its holding would transform *all* state common law claims from core under the statute to non-core under the Constitution while stating that its ruling would not meaningfully change the division of labor in the current statute!

There is more.  The Court then justified its holding of unconstitutionality even though the decision did "not change all that much."   The Court asked rhetorically whether there really is "a threat to the separation of powers where Congress has conferred the judicial power outside Article III *only over certain counterclaims in bankruptcy*?"[84]   It quickly answered yes-even "*[s]light encroachments* create new boundaries from which legions of power can seek new territory to capture."[85]   The Court concluded that it could "not compromise the integrity of the system of separated

---

[82] *Id.*

[83] *Id.* (emphasis added).

[84] *Id.* (emphasis added).

[85] *Id.* (quoting *Reid v. Covert*, 354 U.S. 1, 39, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957)) (emphasis added).

powers and the role of the Judiciary in that system [as a] statute may no more lawfully *chip away* at the authority of the Judicial Branch than it may eliminate it entirely."[86] Again, had the Supreme Court believed its opinion would render delineating as core all state law claims was unconstitutional it would not have characterized the infraction as "slight," "chipping away at the authority of the Judicial Branch," or "obnoxious in its mildest and least repulsive form."[87]

Finally, as discussed earlier, the Court summarized its ruling in a very narrow way: "Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not

---

[86]  *Id.* (emphasis added).

[87]  In addition, one could broadly argue that the concern of constitutional avoidance should apply to the Supreme Court's ruling. While normally applied to statutes its reasoning can be readily applied to the situation before this Court–determining whether the Supreme Court's ruling will render unconstitutional a large or a small number of proceedings defined by Congress as core, *see, e.g., Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) ("'[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (citations omitted)); *Almendarez–Torres v. United States*, 523 U.S. 224, 237 (1998) (holding that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." (citations omitted)); *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (U.S. 1916) (*citing United States v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."). To the extent applicable, this canon supports interpreting *Stern* narrowly. *Clark v. Suarez Martinez*, 543 U.S. 371, 381 (2005) ("[O]ne of the canon's chief justifications is that it allows courts to avoid the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.").

resolved in the process of ruling on a creditor's proof of claim."[88]  If the Supreme Court believed that its holding would be broadly interpreted it could and would have said so. To the contrary, it took pains to limit the facts and the holding.  Certainly, if the Court believed its holding would have the broad implications as some have suggested, it would not have marveled at all the "fuss."[89]

### (iii)    Conclusion

To broadly apply *Stern's* holding is to create a mountain out of a mole hill.  The Supreme Court was concerned with a challenge "that may seem innocuous at first blush" to the separation of powers "where Congress has conferred the judicial power outside Article III only over certain counterclaims in bankruptcy."  Its opinion should be read in such a spirit and its numerous attempts to limit its scope should be respected.[90]  To expand the reach of the opinion farther is to do violence to its plain meaning.[91]

---

[88]  *Id.*

[89]  "If the Court's statement of the import of the decision is accepted at face value, it causes some disruption of the core–proceedings scheme established by §157, but it does not require a major overhaul of [the] bankruptcy courts' exercise of jurisdiction like the one caused by *Northern Pipeline*.  It means that a bankruptcy court cannot enter a final judgment on some counterclaims asserted by the estate against a creditor who files a proof of claim–at least if the parties do not consent to that exercise of authority by the bankruptcy court.  But §157's authorization for the exercise of jurisdiction by the bankruptcy court is otherwise unaffected.  Under that reading, the only issues requiring resolution of *Stern* are the validity of party consent to a bankruptcy court's determination of a state law counterclaim and the procedure that bankruptcy courts should follow when they are unable to enter a final judgment on such a claim."

Nat'l Bankr. Conf. Comm. on Ct. and Admin. Sys., The Scope and Implications of <u>Stern v. Marshall</u> at *4 (internal citations omitted).

[90]  See, e.g., *S. Elec. Coil v. Firstmerit Bank, N.A.*, 2011 U.S. Dist. LEXIS 144832 (D. Ill. 2011); *McClelland v. Grubb & Ellis Valuation & Advisory Group (In re McClelland)*, 2011 Bankr. LEXIS 4752 (Bankr. S.D.N.Y. Dec. 9, 2011); *Kirschner v. Agoglia (In re Refco Inc.)*, 2011 Bankr. LEXIS 4496 (Bankr. S.D.N.Y. Nov. 30, 2011); *In re Ambac Fin. Group, Inc.*, 457 B.R. 299 (Bankr. S.D.N.Y. 2011); *In re Washington Mut., Inc.*, 2011 Bankr. LEXIS

**4.      Count 15 Is A Core Matter Under The Statute And The Constitution.**

The Court may now quickly dispose of the matter before it.  As discussed above, Count 15, which asserts a claim for equitable subordination, is a non-enumerated core proceeding under section 157(b).[92]    Moreover, as it does not involve a state law counterclaim to a proof of claim filed by the trustee, the Supreme Court's holding in *Stern* is not applicable.[93]   The inquiry in this case is limited to the statutory framework.  Thus, Count 15 is a core proceeding under both the statute and the Constitution.[94]   An order will be issued.

---

3361 (Bankr. D. Del. Sept. 13, 2011); *Paloian v. Am. Express Co. (In re Canopy Fin., Inc.)*, 2011 U.S. Dist. LEXIS 99804 (N.D. Ill. Sept. 1, 2011); *Miller v. Greenwich Capital Fin. Prods.*, 457 B.R. 314 (Bankr. D. Del. 2011); *In re Salander O'Reilly Galleries*, 453 B.R. 106, 115–116 (Bankr. S.D.N.Y. 2011) ("Stern is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case, and the ruling does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations . . .").

[91]   Of course, if a matter falls within the confines of the *Stern* Court's decision, the judge must apply the Supreme Court's holding to determine whether the matter before it is a core proceeding under the Constitution.

[92]   *See* pp. 12–16, *supra.*

[93]   *See* pp. 24–27, *supra.*  No further constitutional issues have been raised.

[94]   The defendants assert that all the counts should be dismissed because they are "core but unconstitutional."  This argument is counter to the Supreme Court's holding.   *See* p. 4, *supra.*  A claim that is core under the statute but for which the bankruptcy court lacks judicial authority under the Constitution, by definition, is non–core and the bankruptcy court has related to jurisdiction over the matter.  *Id.*